Elliott J. Roschuni and June G. Roschuni v. Commissioner. Osceola Mortgage and Investment Company v. Commissioner.
Roschuni v. Commissioner
Docket Nos. 4935-62, 4936-62.
United States Tax Court
T.C. Memo 1964-321; 1964 Tax Ct. Memo LEXIS 17; 23 T.C.M. (CCH) 1984; T.C.M. (RIA) 64321; December 16, 1964
*17 Issue 1. Held, (1) certain amounts paid by Systems for club dues and a trip by June to South America were made for the personal benefit of June, the principal stockholder of Systems, and, as such, constituted constructive dividends to June, Challenge Manufacturing Co., 37 T.C. 650, followed; (2) no part of the cost of an automobile owned by Systems and used by Elliott almost entirely in the operation of Systems' business was a constructive dividend to June; and (3) certain withdrawals by Elliott from Osceola and Systems were in fact bona fide loans to Elliott and not constructive dividends to June. Issue 2. Held, (1) Briarcliff, a small business corporation, subject to sections 1371-1377, I.R.C. 1954, was not entitled to report a 1958 sale of a hotel on the installment basis; (2) the fair market value on September 25, 1958, of a third mortgage note of $42,593.58 received as part consideration for the sale did not exceed the sum of $22,212.97; (3) the profit from the sale was $71,743.07 instead of $91,245.57 as determined by the respondent; and (4) such profit must under section 1375(d)(1), I.R.C. 1954, and section 1.1375-1(a), Income Tax Regs. , be reduced by the operating loss of *18 Briarcliff for 1958 of $3,724.61. Issue 3 has become moot. Issue 4. Held, the transfer by June on or about April 30, 1959, of her stock in Daytona, No. 6 and No. 26, for the same number of shares of stock in Osceola was such an exchange of stock as is mentioned in section 354(a)(1), I.R.C. 1954, upon which no gain or loss shall be recognized. Issues 5 and 9 will be settled under Rule 50. Issue 6. Held, the assessment of any tax for the year 1958 against Elliott and June is barred by the statute of limitations. Issue 7. Held, Osceola realized rental income for the year 1958 in the amount of $3,250. Issue 8. Held, Osceola has failed to show error on the part of the respondent in disallowing $654.85 as legal expense for the year 1959. William R. Frazier, Atlantic National Bank Bldg., Jacksonville, Fla., for the petitioners. James D. Ritter, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings respondent has determined deficiencies in income tax as follows: Docket
No.
Year
Petitioner [1] *19 Deficiency
4935-62
1958
Elliott and June
$25,088.69
4935-62
1959
Elliott and June
12,860.74
4935-62
1960
Elliott and June
2,673.37
4936-62
1958
Osceola
690.61
4936-62
1959
Osceola
$ 1,107.54
4936-62
1960
Osceola
841.64 In Docket No. 4935-62, respondent, by amendment to answer, specifically makes claim for an increased deficiency for 1958 in the amount of $501.61 pursuant to the provisions of section 6214(a), I.R.C. 1954. In Docket No. 4935-62, respondent made the following adjustments to the taxable income as disclosed by petitioners' returns: 1958
1959
1960
Taxable income reported
$ 9,680.70
$ 181.39
$13,477.58
Add: Dividends
28,069.44
21,424.89
8,440.76
Gain from sale or exchange of capital assets
28,527.79
17,874.43
0
Medical and dental expense
148.67
457.57
0
Income from Subchapter S Corp.
0
0
435.00
Total
$66,426.60
$39,938.28
$22,353.34
Subtract: Mathematical error on return
180.00
0
0
Taxable income adjusted
$66,246.60
$39,938.28
$22,353.34
By amendment to answer respondent prays to increase the taxable income for 1958 from $66,246.60 as determined by him to $68,108.90, an increase of $1,862.30. In Docket No. 4936-62, respondent made the following adjustments to the taxable income or (loss) as disclosed by petitioner's returns: 1958
1959
1960
Taxable income or (loss) reported
($ 947.98)
$ 359.24
$1,459.99
Add: Income from rents
3,250.00
0
0
Legal expense
0
654.85
0
Net operating loss deduction
0
3,560.56
2,805.47
Taxable income adjusted
$2,302.02
$4,574.65
$4,265.46
*20 In Docket No. 4935-62, petitioners concede that they had taxable income from Subchapter S Corporation of $435 in 1960; and respondent concedes that the cancellation in 1959 of the indebtedness in the amount of $4,641.91 of Maude Gilbert to Systems [2] is not a dividend to June. Nine issues remain to be decided; the first six relate to Docket No. 4935-62; the last three to Docket No. 4936-62. They are: 1. Did June, who was a stockholder of Osceola and Systems, realize distributions of earnings and profits from these corporations in the form of constructive dividends during the calendar years 1958 to 1960, inclusive? 2. Did petitioners understate their dividends, representing gain from the sale of capital assets, from Briarcliff, a small business *21 corporation, in the calendar year 1958? 3. Did petitioners erroneously deduct on their income tax return for 1958 the operating loss incurred by Briarcliff for that year? 4. Did petitioners understate capital gains in the year 1959 from the exchange of stock for assets distributed in complete liquidation of Daytona, No. 6 and No. 26? 5. Did petitioners erroneously deduct medical expenses in the years 1958 and 1959? 6. Is the assessment of the tax for 1958 barred by the statute of limitations? 7. Did Osceola realize rental income for the year 1958? 8. Did Osceola erroneously deduct legal expenses in the year 1959? 9. Is Osceola entitled to a net operating loss deduction in the years 1959 and 1960 in excess of the net operating loss carryover of No. 37 only in the year 1959? Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. In General Petitioners Elliott and June are individuals, husband and wife, with residence at Jacksonville, Fla. They filed their joint Federal income tax returns, Form 1040, for the taxable years 1958 to 1960, inclusive, with the district director of *22 internal revenue at Jacksonville. Elliott and June were married in 1947 and have been married continuously since that time. They have two children of the ages of 12 and 14 as of March 3, 1964. Petitioner Osceola is a corporation organized and existing under and by virtue of the laws of the State of Florida, with its principal office and place of business at Jacksonville. The corporation filed its U.S. corporate income tax return, Form 1120, for the taxable years 1957 to 1960, inclusive, with the district director of internal revenue at Jacksonville. The following corporations were formed on the following dates: Osceola Mortgage and Investment Com-
pany (Osceola)
12/ 1/27
Gilbert System Hotels, Inc. (Systems)
3/11/37
Gilbert Hotel System of Daytona
Beach, Inc. (Daytona)
2/16/33
Gilbert Hotel No. 6, Inc. (No. 6)
8/13/34
Gilbert Hotel No. 26, Inc. (No. 26)
12/18/39
Gilbert Hotel No. 37, Inc. (No. 37)
5/ /44
Gilbert Hotel, Inc. (Briarcliff)
6/28/33
Gilbert Hotel No. 10, Inc. (No. 10)
1/18/35
Motel Paradise, Inc. (Paradise)
7/24/52
All of the outstanding capital stock of the above-named corporations was owned by the following persons on the dates indicated: Name of
No. of
Kind of
Corporation
Stockholder
Shares
Stock
Date Owned
Osceola
June
500
Preferred
1-27-47 to 12-31-60
Osceola
June
270
Common
1-27-47 to 4-30-59
Osceola
Systems
20
Common
1-27-47 to 4-30-59
Osceola
June
394
Common a *23 4-30-59 to 12-31-60
Osceola
Systems
96
Common b
4-30-59 to 12-31-60
Systems
June
170
Preferred
1-27-47 to 12-31-60
Systems
130
Preferred
1-27-47 to 12-31-60
Systems
June
534
Common
1-27-47 to 4-30-59
Systems
10
Common
1-27-47 to 12-31-60
Systems
June
634
Common c
4-30-59 to 12-31-60
Daytona
June
40
Common
1- 1-57 to 4-30-59
Daytona
Systems
10
Common
1- 1-57 to 4-30-59
No. 6
June
34
Common
1- 1-57 to 4-30-59
No. 6
Systems
66
Common
1- 1-57 to 4-30-59
No. 26
June
10
Common
1- 1-57 to 4-30-59
No. 37
June
40
Common
1- 1-57 to 4-30-59
Briarcliff
June
100
Common
1- 1-57 to 4-30-59
No. 10
June
100
Common
1- 1-57 to 12-31-60
Paradise
Elliott
20
Common
All years involved During the years 1957 to 1960, inclusive, the officers of Osceola and the eight corporations set forth in footnote 2 above were as follows: Elliott J. Roschuni… President June Gilbert Roschuni… Vice president and treasurer Arthur Robertson… Secretary Issue 1 Petitioners Elliott and June are the same persons as the petitioners in the Tax Court case of Elliott J. Roschuni, 29 T.C. 1193, which was tried before this Court on February 5, 1957. This Court filed its report on March 31, 1958, and entered its decision on July 24, 1958, for total deficiencies in income tax for the taxable years 1947 to 1951, inclusive, in the amount of $30,484.28. The total liability, including accrued interest, amounted to approximately $55,000. The decision was affirmed per curiam on November 10, 1959, 271 F. 2d 267 (C.A. 5), and the petition for a writ of certiorari to the United States Supreme Court was denied on May 23, 1960 (362 U.S. 988). During the period in question, Elliott made efforts to borrow from several sources the money required to discharge *24 Elliott's and June's liability, as a result of the Tax Court decision, but was not successful. Elliott and June also gave consideration to selling some of the property comprising a part of the hotel chain but the sale of this property did not materialize. After consulting with a local real estate agent, Elliott decided the most feasible way to raise this money was to arrange for a sale of the residence of Elliott and June at 4424 Ortega Forest Drive in Jacksonville (hereinafter sometimes referred to as Ortega) since it was thought that the property could be sold for a reasonable price and not as a distress sale. During the years involved in the instant case, as well as certain years prior, June had accounts with all of the above-named corporations except Paradise, and Elliott had accounts with Briarcliff, Systems, Osceola and Paradise. The accounts of Elliott and June with the aforesaid corporations reflected money or property taken out of the various corporations by Elliott and June resulting in debit entries to their respective accounts, which in turn were treated as accounts receivable (assets) on the books of the respective corporations. The corporations also issued financial *25 statements to third parties showing the accounts in question as accounts receivable. Prior to the filing of the report in the previous Tax Court case (29 T.C. 1193), a multitude of debit entries was made to June's account with Systems from February 3, 1945, until in November 1957 her account had a debit balance in the amount of $167,420.60. Elliott's account with Osceola was opened in September 1953 with a debit entry of $1,000. No further entries were made to his account until August 1957 after the hearing of the previous Tax Court case on February 5, 1957. Thereafter, his account increased to its present outstanding balance of $76,751.74, which amount was achieved by June 30, 1960. On March 31, 1958, Elliott's account with Osceola had a debit balance in the amount of $12,150. Elliott's account with Systems was opened in March 1951 and increased to $86,188.56 by October 1, 1957, notwithstanding the application of 19 credit entries totaling $44,992.42. On October 1, 1957, a credit in the amount of $86,188.56 was applied to Elliott's account with Systems, reducing it to zero, which credit was not a payment but arose by reason of the transfer of $29,469.61 of his account with Briarcliff *26 and the balance by reason of a note given by him to Systems. After this Court filed its report in the previous tax case on March 31, 1958, Elliott's account with Systems again rose from zero to a debit balance in the amount of $45,590.50 by December 31, 1960. Of this increase, $33,469.61 was due to the transfer of his account from Briarcliff back to Systems on April 30, 1959, after the merger of the former with the latter. On April 29, 1954, a resolution was adopted by Systems to accept the offer of June to deed the Ortega residence to Systems, and a credit was made to her account with Systems in the amount of $70,884.65 in May 1954 as a result of the property being deeded to Systems. On June 1, 1957, after the hearing of the previous Tax Court case, which occurred on February 5, 1957, Osceola acquired the residence from Systems at book value of $81,600, computed as follows: Land
$12,517.37
House
59,386.30
Improvements
997.84
Furniture and fixtures
8,698.49
Purchase price
$81,600.00
The transfer from Systems to Osceola was made to protect the Ortega property from certain contingent liabilities of Systems. A portion of the purchase price was satisfied through the assumption of a mortgage in the *27 amount of $21,604.87 and the balance to the extent of $49,819.26 was satisfied through the settlement of an indebtedness Systems owed Osceola. This leaves the satisfaction of $10,175.87 ($81,600 minus $21,604.87, minus $49,819.26) of the purchase price unexplained. Subsequent to the filing of the Tax Court's report in the previous tax case, the Ortega property was transferred by Osceola to Elliott on June 1, 1958, and debit entries were made to his account with Osceola in the amounts of $78,194.98 and $97.44 representing the purchase price and unexpired insurance, respectively; and credit entries were made to his account on the same date in the amounts of $9,000, $407.50, and $20,283.18 representing assumption by him of a second mortgage, taxes, and a first mortgage, respectively, on the residence. No cash changed hands on this transaction. On October 10, 1959, Elliott sold the residence for $85,000 and a portion of the proceeds was applied to the outstanding tax liability of Elliott and June in the previous tax case. The remainder of the proceeds from the sale of the residence was used to purchase a new house. In March 1958, Elliott withdrew $600 from Osceola. In June 1959, Elliott *28 withdrew $1,500 from Osceola for payment on attorney's fees arising from the previous tax case, and in December 1959 he withdrew $8,500 from Osceola for final payment on the tax liability. In June 1960, Elliott withdrew $6,000 from Osceola because money was needed for an undisclosed purpose. Elliott and June did not report on their joint income tax returns for 1958, 1959, and 1960 any of the withdrawals from Osceola. During the years 1959 and 1960 Elliott withdrew the respective sums of $5,116.58 and $2,170.36 from Systems. These withdrawals made by Elliott from Systems were used for his personal need for cash, the mortgage payments on the house lived in by Elliott and June, club dues and parties at Timuquana Country Club and social requirements or, essentially, living and personal expenses of Elliott and June. Elliott and June did not report on their joint income tax returns for 1959 and 1960 the aforementioned withdrawals from Systems. No notes except the note given to Systems in 1957 were given to Osceola or Systems for the amounts debited to the account of Elliott. During the years involved, no interest was charged by Osceola or Systems, nor was any security received for the amounts *29 debited nor any time set for repayment. It was Elliott's intention at all times during the years in question to repay the amounts which he owed Systems and Osceola. He intended to make the repayments from an eventual sale of the property known as Motel Paradise which was a motel located in Birmingham, Ala. The motel contained 27 rental units and during the years in question had a fair market value of approximately $200,000, less an indebtedness of approximately $60,000. The property was owned by Paradise, all the stock of which was owned by Elliott. June, as chief stockholder of Systems and Osceola, intends for her husband to repay the amounts which he owes both of these corporations. During 1959 June made a good will tour of certain South American countries which was sponsored as a so-called "People-to-People Program." She was chairman of the Jacksonville Womans Club Committee, which was concerned with the program. She was asked by the mayor of Jacksonville to take this tour and represent the City of Jacksonville. The purpose of the tour was to select a sister city in South America for Jacksonville. Systems paid $800 of the trip ticket on her behalf. During the years 1958 to 1960, *30 inclusive, Elliott had the use of an automobile owned by Systems. The car was used almost entirely in the operation of Systems' business. Elliott and June had a car of their own for their personal use. During the years 1958, 1959, and 1960, Systems paid club dues at Timuquana Country Club on behalf of Elliott and June in the respective amounts of $133.20, $266,40, and $133.20. During the years involved, June earned annual salaries from Systems of $600 in 1958 and 1959 and $150 in 1960. During the years involved, Elliott earned salaries from the sources indicated, as follows: Source
1958
1959
1960
Paradise
$5,950
$8,058.75
$5,700
No. 10
1,200
1,200.00
300
Systems
600
600.00
150
$7,750
$9,858.75
$6,150
For the taxable years 1959, Elliott reported a dividend in the amount of $18,500 from Paradise which was applied as a credit to his account with Paradise. For the taxable year 1959, June reported a dividend in the amount of $3,250 from Osceola which was applied as a credit to her account with Osceola. At least from April 29, 1954, through October 10, 1959, Elliott and June occupied the Ortega property. From April 29, 1954, to October 10, 1959, the fair market value of the Ortega property, including improvements, *31 furniture and fixtures, ranged from approximately $78,000 to $85,000. While Elliott and June rented the Ortega property from Osceola, Osceola charged them $650 per month rental. Except for the amount of $3,250 with respect to Osceola in 1959, neither Osceola nor Systems declared any formal dividends during the period involved in this case. The maximum amount of earned surplus and current profits available for distribution as dividends from Osceola is in the amount of $27,736.24, $13,951.38 and $5,937.20 for the taxable years 1958, 1959, and 1960, respectively. The maximum amount of earned surplus and current profits available for distribution as dividends from Systems is in the amount of $126,346.59 for the corporate fiscal year ended June 30, 1959, and in the amount of $52,134.03 for the fiscal year ended June 30, 1960. In his determination the respondent allowed Elliott and June a dividend exclusion of $100 in each of the years 1958 and 1960. The constructive dividends of $28,069.44, $21,424.89 and $8,440.76, determined by respondent in Docket No. 4935-62 for the respective years 1958, 1959, and 1960, are made up of the following items: Item
1958
1959
1960
Elliott's withdrawal from Osceola
$ 600.00
$10,000.00
$6,000.00
Transfer of Ortega from Osceola to Elliott
78,194.98
0
0
Transfer of Ortega from Osceola to Elliott
97.44
0
0
Credit entries to Elliott's account on date of transfer of
$9,000, $407.50 and $20,283.18
(29,690.68)
0
0
Net debits to Elliott's account with Osceola
$49,201.74
$10,000.00
$6,000.00
Available for distribution
27,736.24
13,951.38
5,937.20
(1) Constructive dividends from Osceola
$27,736.24
$10,000.00
$5,937.20
Constructive dividends from Systems: Club dues paid by Systems
$ 133.20
$ 266.40
$ 133.20
Systems' car used by Elliott
300.00
600.00
300.00
June's trip paid partly by Systems
0
800.00
0
Conceded item (Maude Gilbert)
0
4,641.91
0
Elliott withdrew from Systems
0
5,116.58
2,170.36
Totals from Systems
$ 433.20
$11,424.89
$2,603.56
Available for distribution
(Substantially in excess of above
totals)
(2) Constructive dividends from Systems
$ 433.20
$11,424.89
$2,603.56
Totals of (1) and (2)
28,169.44
21,424.89
8,540.76
Less exclusions
100.00
0
100.00
Constructive dividends determined
$28,069.44
$21,424.89
$8,440.76
*32 Issues 2, 3, and 6 [3]
In the statement attached to the deficiency notice, the respondent explained the adjustment to taxable income for 1958 of $28,527.79 thus: It is determined that your gain from sale of capital assets distributable to you from The Gilbert Hotel, Inc., a small business corporation, amounted to $45,622.79 in lieu of $17,095.00 reported on your income tax return. Therefore, your taxable income is increased $28,527.79. The $45,622.79 mentioned in the above explanation is 50 percent of the net long-term capital gain of $91,245.57 determined by the respondent from the sale in 1958 by Briarcliff of the Briarcliff Hotel, as hereinafter stated. Briarcliff duly made an election and qualified for treatment as a small business corporation pursuant to subchapter S of chapter 1 (sections 1371-1377) of the Internal Revenue Code of 1954 for the years 1958 to 1960, inclusive, except that Briarcliff was merged into Systems on April 30, 1959. On March 17, 1959, Briarcliff filed a U.S. small *33 business corporation return of income, Form 1120-S, with the district director of internal revenue, Jacksonville, Fla.
During the year 1958, Briarcliff sold the Briarcliff Hotel to Gateway Motors, Inc., for the contract sales price of $125,000, the manner of payment being as follows: Cash paid on closing
$ 23,000.00
First mortgage assumed
48,486.03
Second mortgage assumed
9,798.50
Third purchase money mortgage
note *
41,715.47
$125,000.00
Briarcliff had an adjusted basis in the Briarcliff Hotel at the time of the sale in 1958 of $28,468.23. The expenses of sale relative to the sale of the Briarcliff Hotel totaled $5,286.20. Briarcliff reported on its small business return of income the sale of the Briarcliff Hotel as an installment sale and as such reported a net long-term capital gain of $34,190 which, in "a statement attached to the return" [Section 6501(e)(1)(A)(ii), I.R.C. 1954], it explained thus: Computations for Installment Reporting of
Gain on Sale of Briarcliff Hotel
Selling Price
$125,000.00
Less: Adjusted Basis
$28,468.23
Expense of Sale
5,286.20
33,754.43
Profit to be realized
$ 91,245.57
Assumption by buyer of
1st mortgage
$48,486.03
Assumption by buyer of
2nd mortgage
9,798.50
$58,284.53
Selling Price
$125,000.00
Less: Assumption of above mort-
gages
58,284.53
Total Payments to be received
$ 66,715.47
Cash payment
$25,000.00
$25,000.00 X $91,245.57 / $66,715.47 = $34,190.00 Recognized
Gain
*34 The respondent determined that Briarcliff, under section 1.453-4(c) of the Regulations under the 1954 Code, was not entitled to treat the sale of the Briarcliff Hotel under the installment sales method inasmuch as payments greater than 30 percent of the selling price of $125,000 ($37,500) were received in the year of sale, computed as follows: Payments Received: First mortgage assumed
$48,486.03
Second mortgage assumed
9,798.50
Less: Basis
(28,468.23)
Excess of assumed mortgages over
basis
$29,816.30
Cash
25,000.00
Total payments received
$54,816.30
The respondent further determined that the net long-term capital gain from the sale of the Briarcliff Hotel was the face amount of the "Profit to be realized" reported by Briarcliff of $91,245.57 instead of $34,190 and, after reducing these amounts by 50 percent, determined that petitioners' income should be increased by $28,527.79. He did this more than 3 years but less than 6 years from the date Briarcliff filed its return for 1958 and more than 3 years but less than 6 years from the date Elliott and June filed their joint return for 1958. The third purchase money mortgage note dated September 25, 1958, from Gateway Motors, Inc., to Briarcliff provided *35 for the payment of interest at the rate of 6 percentum per annum, and provided for payment on the principal at the rate of $250 per month after the second mortgage on the Briarcliff Hotel was paid in full, but contained an option to the maker to make payments on the principal before the second mortgage was paid in full. Less than one year after the execution of the $42,593.58 note, Systems (then the holder of the note after the merger of Briarcliff into Systems on April 30, 1959) discounted the note to the maker on May 19, 1959, for the amount of $22,212.97 [4] cash. The fair market value of the third mortgage note on September 25, 1958, did not exceed the sum of $22,212.97. On their individual return for 1958, Elliott and June reported dividends from Briarcliff as being derived from the sale of capital assets in the amount of $17,095 as being 50 percent of the amount of $34,190. During the year 1958, Briarcliff, exclusive of the net long-term capital gain from the sale of the Briarcliff Hotel, incurred an excess of deductions ($51,697.90) over revenues ($47,973.29) or an operating loss in the amount of $3,724.61. On their *36 individual return for 1958 in schedule H, Elliott and June deducted from income the operating loss of Briarcliff in the amount of $3,724.61. In the case of Elliott and June for 1958, instead of additional income of $28,527.79 as "Gain from sale or exchange of capital assets," as determined by the respondent, such additional income, if not barred by the statute of limitations, should be the amount of $16,914.23 determined as follows: Profit determined by respondent
$91,245.57
Less discount of third mortgage
($41,715.47 less $22,212.97)
19,502.50
Corrected profit
$71,743.07
Less operating loss of Briarcliff
3,724.61
Dividends chargeable to petitioners
$68,018.46
Taxable capital gain (50% of
$68,018.46)
$34,009.23
Reported by petitioners
17,095.00
Additional income
$16,914.23
Statute of Limitations for 1958. Petitioners Elliott and June reported gross income on their return for the taxable year 1958 in the amount of $84,446.07, computed as follows: Salary
Systems (June)
$ 600.00
Paradise (Elliott)
5,950.00
No. 10 (Elliott)
1,200.00
Systems (Elliott)
600.00
$ 8,350.00
Subchapter S dividends as ordinary
income (Sch. H) Paradise
2,763.92
Subchapter S dividends as long-term
capital gain (Sch. D) Briarcliff
(50% of $34,190)
17,095.00
Business or Profession (Sch. C) Gil-
bert Hotel No. 19
56,237.15
Total gross income reported
$84,446.07
*37 On their return for 1958 petitioners Elliott and June omitted from gross income amounts properly includible therein of $17,047.43 ($133.20 from Systems and $16,914.23 from Briarcliff), which amount of $17,047.43 is less than 25 percent of the amount of gross income of $84,446.07 stated in their return for that year. The assessment of any tax for the year 1958 against Elliott and June is barred by the statute of limitations. Issue 4 This issue involves respondent's adjustment to petitioners' taxable income for 1959 of "Gain from sale or exchange of capital assets $17,874.43" set out in our preliminary statement. The respondent arrived at the amount of $17,874.43 (none of which was reported by petitioners) as follows: Long-term capital gain: Daytona
$27,888.30
No. 6
4,771.54
No. 26
3,089.03
$35,748.87
Less 50% deduction
17,874.44
Net capital gains
$17,874.43
On April 29, 1959, a special meeting of all the stockholders and directors of Osceola was held at the office of the corporation in Jacksonville. Elliott acted as chairman of the meeting and Robertson as secretary. At this meeting Elliott explained to those present that the purpose for which the meeting had been called was to consider and pass *38 upon a proposed plan of reorganization whereby Osceola would acquire all the assets, subject to outstanding liabilities, of No. 37, No. 6, No. 26 and Daytona, in exchange for shares of its own stock, after which the several transferring corporations would surrender their charters in final liquidation and dissolution. He also explained that the merger, as planned, would qualify as a "C" reorganization as prescribed by section 368(a)(1)(C) of the 1954 Code. After full and complete discussion of this matter, the following resolution was, upon motion duly made, seconded and unanimously carried and adopted: BE IT RESOLVED that the appropriate officers of this corporation are hereby authorized and directed to take any and all necessary steps to effectuate the foregoing plan or reorganization, whereby this corporation will acquire all the assets, subject to the outstanding liabilities, of Gilbert Hotel No. 37, Inc., Gilbert Hotel No. 6, Inc., Gilbert Hotel No. 26, Inc., and Gilbert Hotel System of Daytona Beach, Inc., in return for this corporation's issuing to the stockholders of the transferring corporations shares of its authorized voting common stock, as set forth above, and that as promptly *39 as possible after the merger, the transferring corporations will surrender their Charter in final liquidation and dissolution, all of which shall be implemented as soon as practicable hereafter. On the same day, April 29, 1959, special meetings of all the stockholders and directors of No. 37, [5] No. 6, No. 26 and Daytona were held at the offices of those corporations in Jacksonville. Elliott acted as chairman of the meetings and Robertson as secretary. The minutes of the meetings are all substantially the same except for figures and the hour of the day that the particular meeting was held. Illustrative of all four corporations, the material part of the minutes of the meeting of Daytona stated: The following resolution was, upon motion duly made, seconded and unanimously carried, adopted: BE IT RESOLVED that the appropriate officers of this corporation are hereby authorized and directed to take any and all necessary steps to cause this corporation to be merged with Osceola Mortgage and Investment Company, a Florida corporation, under a plan whereby this corporation would assign all its assets, subject to liabilities, to Osceola Mortgage and Investment Company, in return for which this *40 corporation will issue shares of its authorized common voting stock to the stockholders of this corporation, who, in turn, will surrender their stock in this company in final liquidation and dissolution. On or about April 29, 1959, No. 37, No. 6, No. 26 and Daytona assigned and conveyed all of their assets, subject to outstanding liabilities, to Osceola, which in turn issued to the stockholders of the transferor corporations shares of its own common stock in equal numbers to the outstanding shares of the transferor corporations, all in accordance with the resolutions of the several corporations set out previously herein. The reason for the "plan" as set out in the above resolutions was to eliminate the necessity of filing State and Federal tax returns on the basis of the four transferring corporations and to eliminate the necessity for the payment of State franchise taxes and to eliminate the keeping of multiple sets of books and records for each of the corporations. Following the execution of the plan, it was *41 possible to dispense with the services of one bookkeeper who was assisting in keeping these books and records. The assets acquired by Osceola as a result of the execution of the resolutions of April 29, 1959, were principally accounts receivable representing sums owed No. 37, No. 6, and No. 26 and Daytona by June except for relatively small sums owed No. 37 and No. 26 by Systems. These accounts remain at the present time and have never been cancelled or in any way transferred to June. The following corporations conducted no business activities since the dates indicated: Corporation
Date
Daytona
1950
No. 6
1950
No. 26
1957
Osceola
1957
No. 37
1958
Under the resolutions of the respective corporations adopted on April 29, 1959, the stock of the transferor corporations was surrendered in final liquidation and dissolution and the transferor corporations were dissolved. The reorganization and merger of the four corporations on April 30, 1959, were undertaken for a good, valid, and sufficient business reason. Issue 5 On their returns for 1958 and 1959 petitioners reported total medical expenses in the amounts of $772.55 and $1,348.11, respectively, of which the amounts of $246.64 and $139.55 constituted *42 cost of medicines and drugs in excess of 1 percent of the adjusted gross income reported in the respective years 1958 and 1959. On their returns for 1958 and 1959 petitioners claimed medical deductions in the amounts of $148.67 and $457.57, respectively. These amounts were disallowed by respondent. Issue 7 On June 1, 1957, Osceola acquired the Ortega property from Systems and rented it to Elliott and June for $650 per month. Osceola owned the Ortega property until June 1, 1958. Elliott and June lived on the Ortega property continously at least from June 1, 1957, to June 1, 1958, inclusive. Osceola's books and records were kept on the accrual basis for the taxable year 1958. Osceola did not report on its return (original or amended) for the taxable year 1958 rental income in the amount of $3,250 derived from the Ortega property for the 5-month period from January 1, 1958, to June 1, 1958, inclusive. Issue 8 On its original and amended returns for 1959 Osceola took a deduction for legal expenses in the amount of $3,431.24. The respondent disallowed $654.85 of the amount deducted and, in a statement attached to the deficiency notice sent to Osceola, explained the disallowance thus: (a) *43 The deduction of $3,431.24 claimed for the legal expense has been disallowed to the extent of $654.85 because it has not been established that the amount in excess of $2,776.39 constitutes an ordinary and necessary business expense. Therefore, your taxable income is increased in the amount of $654.85. Opinion Issue 1 This issue is divided into two major parts (a) whether the club dues and a part of the cost of June's trip to South America in 1959, and a part of the cost of an automobile used by Elliott during the taxable years here involved, all paid by Systems, are constructive dividends to June; and (b) whether withdrawals from Osceola and Systems by Elliott, including as a withdrawal the transfer of Ortega from Osceola to Elliott, are constructive dividends to June to the extent of earnings and profits of Osceola and Systems available for the payment of dividends. The applicable statute is section 316(a), I.R.C. 1954, the material provisions of which are in the margin. [6] *44 In Elliott J. Roschuni, 29 T.C. 1193, affirmed per curiam, 271 F. 2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960), involving the years 1947 to 1951, inclusive, we held certain withdrawals by June to be dividends and those by Elliott not to be dividends. In order to avoid any confusion, it may be noted that in Elliott J. Roschuni, supra, we referred to Gilbert System Hotels, Inc., as Hotels, Inc., whereas in the instant case we sometimes refer to that corporation as Systems. The expenditures involved in part (a) of this issue were all made by Systems and were not charged either to Elliott's or June's account with Systems. There is no issue in this case as to the deductibility of the expenditures by the corporation. That entity is not before us. The issue here is simply whether the expenditures made by Systems should be considered as constructive dividends to June. The respondent determined that they should be so considered. In Challenge Manufacturing Co., 37 T.C. 650, we had both a corporation and its stockholders before us. In that case the Commissioner determined *45 that the individual stockholders should have reported as dividends certain amounts which were disallowed as deductions to the corporation. In sustaining the Commissioner's determination, we said, in part: Expenditures made by a corporation for the personal benefit of its stockholders or the making available of corporate-owned facilities to stockholders for their personal benefit may constitute taxable income [as dividends] in amounts equal to the fair value of the benefits involved. * * * As to the club dues and the $800 paid on June's trip to South America, we sustain the respondent's determination. We do not think the individual petitioners have established that the expenditures were made for Systems' benefit rather than the individual's. We hold otherwise as to a part of the cost of an automobile owned by Systems and used by Elliott almost entirely in the operation of Systems' business. The question in part (b) of this issue is whether the withdrawals by Elliott from Osceola and Systems, including the transfer of Ortega from Osceola to Elliott as a withdrawal, were bona fide loans or in substance constructive dividends to June. This is purely a question of fact. Victor Shaken, 21 T.C. 785, 792. *46 In Elliott J. Roschuni, supra, we said: In connection with petitioners' contentions relating to intention and repayment, it is interesting to note the differences between June's withdrawals and those of Elliott. Elliott, who was not a stockholder of Hotels, Inc., [Systems] but was merely a husband and employee, was permitted to make withdrawals only after he had established his own financial responsibility, his repayments on account were regular and really substantial, and he testified convincingly concerning his own intention of repayment. * * * As shown in our findings, Elliott's net withdrawals from Osceola for the years in question were $49,201.74 for 1958, $10,000 for 1959, and $6,000 for 1960; and his withdrawals from Systems amounted to $5,116.58 in 1959, and $2,170.36 in 1960. The largest single item was the transfer of the Ortega property. The purpose of this transfer was to permit the orderly sale of the property by Elliott so that funds would be available to pay a part of the unpaid tax liability for the years 1947 to 1951, inclusive, as a result of our decision for those years entered July 24, 1958. The $10,000 advanced by Osceola in 1959 was for the same purpose and for *47 attorney's fees arising from the tax litigation. The net withdrawals from Osceola for the years 1958 and 1960 were in excess of the surplus of Osceola available for distribution so that in those years the respondent's determination of constructive dividends was limited to the surplus available. We think the evidence shows that the amounts Elliott withdrew from Osceola and Systems during the years in question were bona fide loans from those corporations to Elliott. They were intended as such by all of the parties concerned. They were carried as accounts receivable on the books of both corporations. We think Elliott has established his ability to make the repayments to both corporations from the eventual sale of property owned by Paradise, all the stock of which is owned by Elliott. Elliott is not a stockholder in either Osceola or Systems. We hold that the withdrawals in question under part (b) of this issue were bona fide loans and not constructive dividends. Elliott J. Roschuni, supra; Carl L. White, 17 T.C. 1562; Victor Shaken, supra.
Issues 2, 3, and 6 Of these three issues, Issue 6 is the most important. But before that issue can be decided, it was necessary to decide Issue *48 1 as far as the year 1958 is concerned. We held under Issue 1 that for the year 1958 petitioners Elliott and June only omitted from gross income an amount of $133.20. The conclusions we are reaching under Issues 2 and 6 serve to make Issue 3 moot. Under Issue 2, Briarcliff reported the sale of the Briarcliff Hotel on the installment basis but now it is conceded that the sale should have been reported on the completed transaction basis. Briefly, on the completed transaction basis, the respondent contends, by amendment to answer, that instead of a "Gain from sale or exchange of capital assets" determined by him of $28,527.79, the correct amount should have been $26,665.48, determined as follows: Total profit
$91,245.57
Less operating loss
3,724.61
Dividends chargeable to petitioners
$87,520.96
Taxable capital gain (50% of
$87,520.96)
$43,760.48
Reported on return (50% of
$34,190)
17,095.00
Corrected understatement
$26,665.48
Respondent then further contends by amendment to answer that since Briarcliff's operating loss of $3,724.61 must, under section 1375(a)(1), I.R.C. 1954, and section 1.1375-1(a), Income Tax Regs., be used to reduce the dividends chargeable to petitioners, as shown above, petitioners *49 were in error in claiming the amount as a separate deduction on their return (Issue 3), and that the net result of the two ways of treating the operating loss of $3,724.61 is a net increase in taxable income for 1958 of 50 percent of that amount, or $1,862.30, which in turn would produce the claimed increased deficiency for 1958 of $501.61. On the other hand, petitioners Elliott and June contend that the total profit of $91,245.57 claimed by respondent is too high by reason of taking the third purchase money mortgage note into the computation at a fair market value of $41,715.47 on September 25, 1948, instead of a fair market value of $22,212.97. Both parties concede that under section 1001(a), I.R.C. 1954, the gain from the sale or other disposition of property shall be the excess of the "amount realized" over the adjusted basis and that under section 1001(b) "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." What the "fair market value" of the third purchase money mortgage note was on September 25, 1948, is a question of fact. Section 1001-1(a) of the Regulations *50 under the 1954 Code. We have found as a fact that the fair market value of the third purchase money mortgage note on September 25, 1948, did not exceed the sum of $22,212.97. On the basis of that finding the corrected profit from the sale of the Briarcliff Hotel is $71,743.07 as set out in our findings. We agree with the respondent that under section 1375(a)(1), I.R.C. 1954, and section 1.1375-1(a), Income Tax Regs., Briarcliff's operating loss of $3,724.61 must be used to reduce the dividends chargeable to petitioners. Petitioners in effect concede that the operating loss must be so used. When this is done the dividends from the subchapter S corporation Briarcliff chargeable to petitioners is $68,018.46, only 50 percent of which, or $34,009.23 is taxable to petitioners as capital gain. Since petitioners reported $17,095 as capital gain on their individual return for 1958, the amount of capital gain "omitted from gross income" [section 6501(e)(1)(A)(ii), I.R.C. 1954] under Issue 2 is $16,914.23. Issue 6. Both parties agree that the statute has run in the case of the individual petitioners for 1958 unless under section 6501(e)(1)(A), I.R.C. 1954, [7] the respondent has 6 years after *51 the return was filed in which to make the assessment. For reasons hereinafter stated we do not think the respondent has the 6 years in which to make the assessment. We held under Issues 1 and 2 that for the year 1958 petitioners Elliott and June omitted from gross income the respective amounts of $133.20 and $16,914.23, or a total omission of $17,047.43 which is less than 25 percent of the amount of gross income stated in the return of $84,446.07. Therefore, under section 6501(e)(1)(A), supra, the 6-year period within which to make the assessment would not be applicable. However, the respondent contends that in determining whether *52 the so-called omitted amount is greater or less than 25 percent of the amount of gross income stated in the return the long-term capital gain from the sale of the Briarcliff Hotel (Issue 2) should be taken in the computation at 100 percent instead of 50 percent. To illustrate, instead of $17,095 as being the capital gain stated in the return, the respondent would use $34,190 as stated in the return and, instead of $16,914.23 determined by us as omitted from gross income by Briarcliff, the respondent, assuming he accepted the corrected profit as being $71,743.07, would contend that the amount omitted from gross income by Briarcliff was $33,828.46 (twice times $16,914.23, or $68,018.46 minus $34,190). This contention by the respondent is contrary to our holdings in Emma B. Maloy, 45 B.T.A. 1104, 1107, and Frank W. Williamson, 27 T.C. 647, 662. We hold, therefore, that the assessment of any tax for the year 1958 against Elliott and June is barred by the statute of limitations. Issue 4 Respondent has determined that the reorganization or merger of Daytona, No. 6, and No. 26 into Osceola was without business reason or purpose and that there was in substance a complete liquidation of *53 these three corporations resulting in a net capital gain to June in the amount of $17,874.43 (50% of $35,748.87). There is no issue between the parties as to the amount of the gain, but rather as to whether gain in any amount was realized or recognized. Respondent raised no issue as to No. 37 although, as the resolutions set out in our findings show, No. 37 was part and parcel of the same plan. Petitioners contend that the transfer of the assets, subject to the liabilities, of the three corporations to Osceola in exchange for capital stock of the latter, comes squarely within the definition of a reorganization as defined in section 368(a)(1)(C), [8] *54 I.R.C. 1954; and that in accordance with section 354(a)(1), [9] I.R.C. 1954, June recognized no gain or loss when she transferred her stock in Daytona, No. 6, and No. 26, for the same number of shares of stock in Osceola, after which the three transferring corporations were dissolved. We agree with petitioners. We do not think there is any merit in the respondent's sole contention that there was no business purpose for what was done and that, in substance, what was done was a complete liquidation of the three transferring corporations rather than a bona fide transfer of stock for stock in a reorganization. Both Elliott and Robertson testified that the reasons for the action *55 taken on April 29, 1959, were to cut down on the expense and work of filing so many separate State and Federal returns and keeping so many different sets of books. These reasons were also stated in the resolutions themselves. We think they are legitimate business reasons for making the transfers and dissolving the transferring corporations. June did not receive any of the assets owned by the transferring corporations. All of those assets went to Osceola and all June received for her stock in the transferring corporations was stock in Osceola. What was done comes squarely within the provisions of sections 368(a)(1)(C) and 354(a)(1), supra, and we know of no reason to hold otherwise. Under section 358 of the 1954 Code, the basis of the stock of the transferring corporations held by June prior to the transfer became the basis of the stock of Osceola held by June after the transfer. The respondent in his brief says "It is only appropriate to point out the extreme similarity of the instant case to the case of James J. Gravley, 44 B.T.A. 722 (1941)." There is no similarity between Gravley and the present case insofar as the reorganization is concerned. In Gravley, a stockholder had withdrawn *56 funds from his corporation between the years 1927-1936. On December 31, 1936, the corporation was dissolved, and all of its assets, including the taxpayer's account, were transferred to a partnership consisting of the taxpayer and his wife. There was no basis for anyone's attempting to say that this was a tax-free reorganization between a corporation and a partnership. Obviously, if a taxpayer liquidates a corporation and takes its assets and transfers them to a partnership, he will incur the ordinary tax attributable to liquidating the corporation. The Gravley case is not in point. We hold that the respondent erred in adjusting petitioner's taxable income for 1959 by adding thereto net capital gains of $17,874.43. Issue 5 Both parties agree that the deductibility of medical expenses is an automatic adjustment which will depend on the outcome of the case and will therefore be given consideration in the computations to be made under Rule 50. Issue 7 Although Osceola assigned as error the respondent's determination that Osceola realized unreported additional income from rents accrued during 1958 in the amount of $3,250, it has not referred to this issue in either of its briefs. There *57 is no question but what this amount of rent accrued to Osceola during 1958 and should have been reported as income by Osceola. We sustain the respondent's determination as to this issue. Issue 8 Petitioner Osceola offered no evidence to show error on the part of the respondent in disallowing $654.85 of the $3,431.24 deducted by Osceola in its original and amended returns for 1959 as legal expenses. We, therefore, sustain the respondent's determination as to this issue for failure of proof. Issue 9 In the case of petitioner Osceola, the respondent's principal reason for disallowing the net operating loss deductions for 1959 and 1960 in the respective amounts of $3,560.56 and $2,805.47 was his determination that the acquisitions by Osceola in 1959 of the assets and liabilities of No. 6 and No. 26 in exchange for its own stock were not "corporate reorganizations" as that term is defined in section 368, supra. Under Issue 4 we held against the respondent on the reorganization issue. Osceola, in its reply brief, states: In the event that the Court finds for Petitioners on this issue [the reorganization issue], the matter of the amount of the net operating loss carry-over will be a calculation *58 susceptible to disposition under Rule 50. The parties are in complete agreement with the facts. Since we have found for the individual petitioners on the reorganization issue we agree with petitioner Osceola that "the matter of the amount of the net operating loss carry-over will be a calculation susceptible to disposition under Rule 50." We so hold. Decisions will be entered under Rule 50. Footnotes
1. Hereinafter petitioner Elliott J. Roschuni will sometimes be referred to as Elliott; petitioner June G. Roschuni as June; and Osceola Mortgage and Investment Company as Osceola.
2. The following corporations, for the purpose of brevity, are sometimes hereinafter referred to as indicated in parentheses: (a) Gilbert System Hotels, Inc. (Systems) (b) Gilbert Hotel System of Daytona Beach, Inc. (Daytona) (c) Gilbert Hotel No. 6, Inc. (No. 6) (d) Gilbert Hotel No. 26, Inc. (No. 26) (e) Gilbert Hotel No. 37, Inc. (No. 37) (f) Gilbert Hotel, Inc. (Briarcliff) (g) Gilbert Hotel No. 10, Inc. (No. 10) (h) Motel Paradise, Inc. (Paradise)↩
a. On 4-30-59, 124 additional shares issued to June. b. On 4-30-59, 76 additional shares issued to Systems. ↩
c. On 4-30-59, 100 additional shares issued to June.↩
3. Issue 2 involves the adjustment to taxable income for 1958 of $28,527.79. It is in connection with Issues 2 and 3 that the respondent makes claim for an increased deficiency of $501.61 for 1958.↩
*. Dated Sept. 25, 1958, in the face amount of $42,593.58.↩
4. The amount was recorded on the books of Systems as $22,000 even.↩
5. The respondent did not determine any long-term capital gain from No. 37. No. 37 is included here simply because what was done here becomes material in deciding Issue 9, infra.↩
6. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year * * *↩
7. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(e) Omission From Gross Income. - Except as otherwise provided in subsection (c) - (1) Income Taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
8. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. - (1) In general. - For purposes of parts I and II and this part, the term "reorganization" means - * * *
(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or in fact that property acquired is subject to a liability, shall be disregarded; 9. SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS. (a) General Rule. - (1) In general. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.↩